UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARIA ESTHER GONZALES,                ) Case No. CV 14-0078-JPR
                                      )
                    Plaintiff,        )
                                      )
          vs.                         ) **MEMORANDUM OPINION AND ORDER**
                                      ) **AFFIRMING THE COMMISSIONER**
COMMISSIONER OF SOCIAL                )
SECURITY ADMINISTRATION,              )
                                      )
                    Defendant.        )
                                      )
                                      )

**I.    PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision

denying her applications for Social Security disability insurance

benefits ("DIB") and supplemental security income benefits

("SSI").  The parties consented to the jurisdiction of the

undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  This

matter is before the Court on the parties' Joint Stipulation,

filed September 25, 2014, which the Court has taken under

submission without oral argument.  For the reasons discussed

below, the Commissioner's decision is affirmed and judgment is

entered in her favor.

1

## II.   BACKGROUND

Plaintiff was born on June 25, 1955.[1]  (Administrative Record ("AR") 142, 150.)  She completed the fourth grade and worked as a janitor.  (AR 42, 205.)

On December 9 and 16, 2010, respectively, Plaintiff filed applications for DIB and SSI.  (AR 23, 55-56, 142-59.)  In a disability report, she alleged that she had been unable to work since October 1, 2008, because of her high blood pressure, heart murmur, and high cholesterol.  (AR 198-99.)  In late 2011 she further alleged that she had "leg problems" (AR 218) and "osteoarthritis" (AR 228).  After Plaintiff's applications were denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge.  (AR 72-73.)

A hearing was held on July 3, 2012.  (AR 35-52.)  Plaintiff, who was represented by counsel, testified through an interpreter; a vocational expert also testified.  (Id.)  In a written decision issued August 31, 2012, the ALJ found Plaintiff not disabled. (AR 23-31.)  On September 26, 2012, Plaintiff requested Appeals Council review.  (AR 14.)  On November 15, 2013, the council denied the request.  (AR 5-9.)  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and

---

[1]   In her applications, Plaintiff listed her date of birth as June 25, 1955 (see AR 142, 150), but her medical records show it as August 25, 1955 (see, e.g., AR 243-47, 271-80, 282-97), and she testified at the hearing that it was August 25, 1955 (AR 40).

1   supported by substantial evidence based on the record as a whole.

2   See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra

3   v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).   Substantial

4   evidence means such evidence as a reasonable person might accept

5   as adequate to support a conclusion.   Richardson, 402 U.S. at

6   401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

7   It is more than a scintilla but less than a preponderance.

8   Lingenfelter, 504 F.3d at 1035.   To determine whether substantial

9   evidence supports a finding, the reviewing court "must review the

10  administrative record as a whole, weighing both the evidence that

11  supports and the evidence that detracts from the Commissioner's

12  conclusion."   Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

13  1996).   "If the evidence can reasonably support either affirming

14  or reversing," the reviewing court "may not substitute its

15  judgment" for that of the Commissioner.   Id. at 720-21.

16  **IV.   THE EVALUATION OF DISABILITY**

17       People are "disabled" for purposes of receiving Social

18  Security benefits if they are unable to engage in any substantial

19  gainful activity owing to a physical or mental impairment that is

20  expected to result in death or has lasted, or is expected to

21  last, for a continuous period of at least 12 months.   42 U.S.C.

22  § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

23  1992).

24       A.   The Five-Step Evaluation Process

25       The ALJ follows a five-step sequential evaluation process in

26  assessing whether a claimant is disabled.   20 C.F.R.

27  §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,

28  828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first

step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).   The claimant has the burden of proving she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets

---

[2]    RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

that burden, a prima facie case of disability is established.
Id.

     If that happens or if the claimant has no past relevant
work, the Commissioner then bears the burden of establishing that
the claimant is not disabled because she can perform other
substantial gainful work available in the national economy.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination
comprises the fifth and final step in the sequential analysis.
§§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966
F.2d at 1257.

     B.   The ALJ's Application of the Five-Step Process

     At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since October 1, 2008, her alleged
onset date.  (AR 25.)  At step two, she found that Plaintiff had
the severe impairment of "degenerative joint disease, left knee."
(Id.)  She found that Plaintiff's obesity, heart murmur,
hypertension, osteoarthritis, varicose veins, and depression were
not severe (AR 25-26), findings Plaintiff does not challenge.  At
step three, she determined that Plaintiff's impairments did not
meet or equal any of the impairments in the Listing.  (AR 26.)
At step four, the ALJ found that Plaintiff had the RFC to perform
medium work as follows:

          the claimant can lift and/or carry 50 pounds occasionally

          and 25 pounds frequently; she can stand and/or walk for

          six hours out of an eight-hour workday with regular

          breaks; she can sit for six hours out of an eight-

          workday with regular breaks; she is unlimited with

          respect to pushing and/or pulling, other than as

indicated for lifting and/or carrying; she can frequently kneel, stoop, crawl, and crouch; she can frequently climb ramps and stairs; she can frequently climb ladders, ropes, or scaffolds; she has no restrictions relating to the bilateral hands for fine and gross manipulation; she can respond and interact appropriately to coworkers, supervisors, and the general public; she can sustain concentration and attention, persistence and pace in at least two hour blocks of time to complete a normal workday; and the claimant can complete both complex and detailed tasks.

(AR 26-27.) Based on the VE's testimony, the ALJ concluded that Plaintiff was able to perform her past relevant work as a janitor. (AR 30.) Accordingly, she found Plaintiff not disabled. (Id.)

**V. DISCUSSION**

Plaintiff contends that the ALJ erred in (1) assessing the opinion of her treating nurse practitioner, Renanda Stevenson, (2) formulating her RFC, (3) assessing her credibility, and (4) finding that her past relevant work was performed at the light-exertion level.[3] (J. Stip. at 2.)

A.    The ALJ Did Not Err in Assessing Nurse Stevenson's Opinion and Plaintiff's RFC

Plaintiff contends that the ALJ failed to properly consider Nurse Stevenson's opinion (J. Stip. at 25) and that her RFC

---

[3]    The Court addresses the disputed issues in an order different from that followed by the parties, and it discusses the first and second issues together in Section V.A.

should be "limited to sedentary work based upon [her] objectively verified knee impairment" (id. at 3).

### 1.    Applicable law

A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must consider all the medical evidence in the record and "explain in [her] decision the weight given to . . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources."  §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii); see also §§ 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."), 416.945(a)(1) (same); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (RFC is assessed "based on all of the relevant evidence in the case record").  In making an RFC determination, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints.  See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC any findings from treating-physician opinions that were "permissibly discounted").  The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "evidence is susceptible to more than one rational interpretation, the ALJ's decision should

be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks omitted).

2.   <u>Relevant background</u>

On October 14, 2007, Plaintiff visited an emergency room, complaining of right-leg pain since suffering an injury while cleaning one week earlier.  (AR 274, 276.)  She was diagnosed with a hamstring strain and prescribed Norco.[4]  (AR 275.) Plaintiff was seen by clinicians on April 1 and October 2, 2008, and November 25, 2009, but she did not complain of any knee or leg pain at those appointments.  (AR 291-93.)  On April 27, 2010, a clinician noted that Plaintiff "feel[s] ok"; she diagnosed "stable" hypertension and refilled her medications.  (AR 289.)

On November 12, 2010, Nurse Stevenson noted that Plaintiff was "doing well" and had no complaints "at this time."[5]  (AR 288.)  She diagnosed "new onset cardiac murmur," dyslipidemia,[6] and hypertension and refilled Plaintiff's medications.  (<u>Id.</u>)

On May 12, 2011, Dr. Concepcion A. Enriquez, who was board

---

[4]    Norco is a combination of hydrocodone, a narcotic analgesic, and acetaminophen.  <u>Hydrocodone Combination Products</u>, MedlinePlus,   http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a601006.html (last revised Oct. 15, 2014).  It is used to relieve moderate to severe pain.  (<u>Id.</u>)

[5]    Nurse Stevenson wrote "no c/o at this time" (AR 288); "c/o" is a medical abbreviation for "complains of," <u>see</u> <u>Medical Abbreviations</u>, Taber's Online, http://www.tabers.com/tabersonline/ view/Tabers-Dictionary/767492/0/Medical_Abbreviations   (last accessed Feb. 9, 2015).

[6]    Dyslipidemia is a condition marked by abnormal concentrations of lipids or lipoproteins in the blood. Dyslipidemia   Definition,   Merriam-Webster.com,   http:// www.merriam-webster.com/medical/dyslipidemia (last visited Feb. 9, 2015).

eligible in internal medicine, performed an internal-medicine consultation at the Social Security Administration's request. (AR 238-41.)  Dr. Enriquez noted that Plaintiff complained of high blood pressure, heart murmur, high cholesterol, abdominal pain, and "a history of pain on both knees, (right is worse than the left) for eight to nine years." (AR 238.)  Upon examination, Dr. Enriquez found that Plaintiff's knees had grossly normal ranges of motion and no tenderness; her extremities had no swelling, warmth, or crepitus; her motor strength was 5/5 throughout; and her sensation was intact.  (AR 240-41.) Plaintiff's gait and balance were normal, and she did not require an assistive device.  (AR 241.)  Dr. Enriquez found that Plaintiff had "no impairment-related physical limitations." (Id.)

On June 1, 2011, Dr. Kenneth Glass, who specialized in internal medicine,[7] reviewed Dr. Enriquez's report and found that Plaintiff's physical problems were not severe.  (AR 242.)

On June 30, 2011, Plaintiff visited an emergency room, complaining of left-knee and -leg pain.  (AR 247, 255.) Plaintiff claimed to have had left-leg pain for three years (AR 255), and a medical provider noted that she had "slight knee swelling" (AR 249).  Plaintiff was diagnosed with varicose veins (AR 256), prescribed Norco (AR 251, 257), and discharged in

---

[7]     Dr. Glass's electronic signature includes a medical specialty code of 19, indicating internal medicine.  (AR 242); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/ 0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

1    stable condition (AR 256).

2        On July 7, 2011, Nurse Stevenson noted that Plaintiff had
3    just obtained medical insurance and needed a new cardiology
4    referral.  (AR 287.)  A cardiovascular examination revealed a
5    heart murmur, but neurological, musculoskeletal, and skin
6    examinations were normal.  (<u>Id.</u>)  Nurse Stevenson diagnosed
7    dyslipidemia, hypertension, and cardiac murmur and refilled
8    Plaintiff's medications.  (<u>Id.</u>)

9        On July 21, 2011, Nurse Stevenson noted that Plaintiff
10   complained of leg pain for the past four years that had been
11   worsening that year.  (AR 286.)  Nurse Stevenson found that
12   Plaintiff's left knee was moderately to severely tender and
13   slightly swollen.  (<u>Id.</u>)  She ordered a left-knee x-ray,
14   prescribed Ultram,[8] and recommended swimming for weight loss.
15   (<u>Id.</u>)  On July 28, 2011, an x-ray of Plaintiff's left knee showed
16   osteoarthritis.  (AR 243.)

17       On August 15, 2011, Nurse Stevenson discussed the x-ray
18   results with Plaintiff, diagnosed left-knee osteoarthritis, noted
19   that Plaintiff "admits Ultram [is] working well," and referred
20   her for an MRI.  (AR 285.)  That same day, Nurse Stevenson
21   completed a one-page check-off "Medical Assessment of Ability to
22   Do Work-Related Activities."  (AR 259.)  She opined that
23   Plaintiff could lift and carry up to 10 pounds, sit for eight
24   hours in an eight-hour day, and stand or walk for up to an hour

25

26

27       [8]   Ultram, or tramadol, is a narcotic analgesic used to
     relieve moderate to moderately severe pain.  <u>Tramadol</u>, MedlinePlus,
28   http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last
     updated Oct. 15, 2013).

at a time, and stand and walk for a total of two hours in an eight-hour day.  (Id.)  Nurse Stevenson left blank the spaces on the form for listing medical findings that supported her assessment.  (Id.)

On August 23, 2011, medical consultant Dr. V. Phillips, who practiced general or family medicine,[9] reviewed Dr. Enriquez's and Nurse Stevenson's opinions and the June 2011 emergency-room notes and opined that Plaintiff's impairments were not severe. (AR 267.)

On March 1, 2012, Nurse Stevenson noted that Plaintiff was complaining of "a lot of pain" in her left knee and wanted a prescription for pain medication.  (AR 283.)  Nurse Stevenson noted that Plaintiff had a "limping gait" and her left knee was tender and swollen.  (Id.)  She prescribed tramadol and referred Plaintiff for an MRI.  (Id.)  That same day, Nurse Stevenson completed a second medical-assessment form, opining that Plaintiff could lift up to 10 pounds, sit for two hours at a time for a total of eight hours in an eight-hour day, and stand or walk for a half hour at a time, for a total of two hours in an eight-hour day.  (AR 269.)  Under one of the sections for listing medical findings, Nurse Stevenson wrote "L[eft] knee osteoarthritis, pain [and] swelling."  (Id.)

On March 16, 2012, a left-knee MRI showed a complex tear of

---

[9]   Dr. Phillips's electronic signature includes a medical specialty code of 12, indicating "family or general practice." (AR 267); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

the medial meniscus[10] with "mild extrusion of the medial meniscal body causing mild bowing of the medial collateral ligament complex," mild osteoarthrosis,[11] cystic change within the anterior cruciate ligament with no evidence of a full-thickness ACL tear, "a very small joint effusion," and a "small popliteal cyst."[12] (AR 272.) On May 23, 2012, Nurse Stevenson discussed the MRI results with Plaintiff; noted that neurological, musculoskeletal, and skin examinations were normal; diagnosed cardiac murmur, hypertension in poor control, dyslipidemia, and left-knee pain due to osteoarthritis; and prescribed naprosyn and Vicodin.[13] (AR 282.)

On May 31, 2012, Physician Assistant Da Thao Neria at Corona Temecula Orthopedic Associates noted that Plaintiff complained of left-knee pain and swelling. (AR 295.) Neria found that

---

[10] The meniscus is a rubbery, C-shaped disc that cushions the knee. Meniscus Tear, WebMD, http://www.webmd.com/a-to-z-guides/meniscus-tear-topic-overview (last updated Sept. 10, 2012).

[11] Osteoarthrosis is a synonym for osteoarthritis. See Stedman's Medical Dictionary 1283 (27th ed. 2000).

[12] A popliteal cyst is a fluid-filled cyst that causes a bulge and feeling of tightness behind the knee. Baker's cyst, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/bakers-cyst/basics/definition/con-20023332 (last updated Aug. 1, 2012).

[13] Naprosyn, or naproxen, is a nonsteroidal anti-inflammatory drug ("NSAID") used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and other conditions. Naproxen, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last revised July 15, 2014). Vicodin is a combination of hydrocodone, a narcotic analgesic, and acetaminophen. Hydrocodone Combination Products, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last revised Oct. 15, 2014). It is used to relieve moderate to severe pain. (Id.)

Plaintiff had decreased range of motion, joint pain, and joint swelling.  (Id.)  She noted that Plaintiff's x-rays indicated "advanced degenerative changes," and her March 2012 MRI revealed a medial-meniscus tear of the posterior horn.  (AR 296.)  She diagnosed left-knee "severe" osteoarthritis, administered a cortisone injection, prescribed diclofenac,[14] and noted that Plaintiff "[u]ltimately" "may require a total knee arthroplasty[15] in the future" and that they would "consider viscosupplement[16] at the next visit if the cortisone fails to help."  (Id.)

In her August 31, 2012 decision, the ALJ found that Plaintiff had the RFC to perform a range of medium work.  (AR 26-27.)  In doing so, she accorded "little weight" to Dr. Enriquez's opinion that Plaintiff had no physical limitations because "subsequent diagnostic studies and clinical findings" "call[ed] for some functional limitations."  (AR 29.)  The ALJ also accorded little weight to the consulting physicians' opinions, noting that they "did not have the benefit of reviewing subsequently submitted medical evidence."  (Id.)  Finally, the

---

[14]   Diclofenac is a NSAID used to relieve mild to moderate pain, tenderness, swelling, and stiffness caused by osteoarthritis and other conditions.  Diclofenac, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html (last updated Dec. 15, 2014).

[15]   "Total knee arthroplasty" is knee-replacement surgery. Knee replacement, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/knee-replacement/basics/definition/prc-20019202 (last updated Oct. 30, 2012).

[16]   "Viscosupplementation is a procedure in which a thick fluid called hyaluronate is injected into the knee joint." Viscosupplementation, Cleveland Clinic, http://my.clevelandclinic.org/health/treatments_and_procedures/hic_viscosupplementation (last accessed Feb. 9, 2015).

1   ALJ accorded "little weight" to Nurse Stevenson's opinion because
2   it was not supported by the medical evidence.  (Id.)

3            3.   Analysis

4        In formulating Plaintiff's RFC, the ALJ stated that she had
5   considered "the opinions of the State agency review physicians,
6   the opinions of the consultative examiner, the opinions of the
7   claimant's treating consultants, the claimant's testimony, her
8   behavior at the hearing, her past medical history, and the
9   diagnostic and clinical findings of record" and "str[uck] a
10  balance" among all of that evidence.  (Id.)  Plaintiff argues
11  that the ALJ's RFC assessment was erroneous because she should
12  not have rejected Nurse Stevenson's opinions (J. Stip. at 25-26)
13  and because "no medical record supports a capacity for medium
14  work" (id. at 5).

15       The ALJ did not err in rejecting Nurse Stevenson's opinions.
16  As an initial matter, the ALJ correctly noted that Stevenson was
17  a nurse practitioner and "not a licensed psychologist or
18  physician"; thus, she did "not qualify as an acceptable medical
19  source."  (AR 29); see §§ 404.1513(a) (listing "acceptable
20  medical sources"), 416.913(a); §§ 404.1513(d) (nurse
21  practitioners are "other sources"), 416.913(d) (same).  Because
22  Nurse Stevenson was considered an "other source" under the
23  agency's regulations, the ALJ needed to provide only "germane"
24  reasons for rejecting her opinions.  See Molina v. Astrue, 674
25  F.3d 1104, 1111 (9th Cir. 2012).

26       The ALJ rejected Nurse Stevenson's opinions because they
27  were "not supported by the medical evidence."  (AR 29.)  As the
28  ALJ observed (AR 28), Plaintiff did not complain to her medical

14

providers of left-knee pain until she visited the emergency room in June 2011, years after her alleged onset date of October 2008. (AR 247.)  In July 2011, Nurse Stevenson found only moderate-to-severe tenderness and slight swelling; she prescribed Ultram and recommended that Plaintiff start swimming.  (AR 286.)  In August 2011, Stevenson diagnosed left-knee osteoarthritis and noted Plaintiff's report that Ultram was "working well."  (AR 285.) Despite those minimal findings, that same day Nurse Stevenson opined that Plaintiff had significant physical limitations, consisting of lifting only 10 pounds and standing or walking up to an hour at a time for a total of two hours in an eight-hour day.  (AR 259.)  Moreover, Plaintiff did not again seek treatment for her knee impairment until seven months later, in March 2012, when she requested pain medication and Nurse Stephenson noted that she a "limping gait" and a "tender and swollen" left knee.[17] (AR 283.)  That same day, Nurse Stevenson opined that Plaintiff had even more significant limitations than in her previous opinion, stating that Plaintiff could lift only 10 pounds, sit two hours at a time, and stand or walk a half hour at a time for a total of two hours in an eight-hour day.  (AR 269.)  Such relatively mild examination results fail to support Nurse Stevenson's finding of significant limitations.  Moreover, as the ALJ also noted, Nurse Stevenson's finding that Plaintiff was limited to lifting less than 10 pounds was "not supported by the medical evidence" showing that Plaintiff "had a lower extremity impairment that would not significantly affect her ability to

---

[17]    During  this  entire  period,  Plaintiff  had  medical insurance.  (See AR 287.)

1  lift." (AR 29.)  The ALJ permissibly discounted Nurse

2  Stevenson's opinions.  See Bayliss, 427 F.3d at 1218

3  ("[i]nconsistency with medical evidence" is germane reason for

4  discounting lay opinion); cf. Thomas v. Barnhart, 278 F.3d 947,

5  957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any

6  physician, including a treating physician, if that opinion is

7  brief, conclusory, and inadequately supported by clinical

8  findings.").

9      The medical records also fail to support Nurse Stevenson's

10 opinion because they show that Plaintiff received only

11 conservative treatment for her knee condition.  (See AR 28 (ALJ's

12 finding that Plaintiff received only "routine" and "conservative"

13 treatment for left-knee pain).)  As noted above, Nurse Stevenson

14 prescribed medication to treat Plaintiff's allegedly disabling

15 knee impairment (see AR 283, 288-86) and she noted that Ultram

16 was "working well" (AR 285).  In May 2012, a physician's

17 assistant reviewed Plaintiff's MRI and x-ray reports and noted

18 that total-knee arthroplasty "may" be required "in the future,"

19 but she treated Plaintiff's knee pain conservatively, with a

20 cortisone injection and medication.  (AR 296.)  That Plaintiff

21 received only conservative treatment was a germane reason for

22 discounting Nurse Stevenson's opinion.  Cf. McKnight v. Comm'r

23 Soc. Sec., No. 1:12-cv-00726-AWI-JLT, 2013 WL 3773864, at *9

24 (E.D. Cal. July 17, 2013) (ALJ properly discounted physician's

25 opinion based on claimant's positive response to conservative

26 treatment, including knee injections and pain medication).

27     Nor did the ALJ err in formulating an RFC for medium work.

28 The ALJ noted that "the positive objective clinical findings"

since the alleged onset date "do not support more restrictive functional limitations" than those in the RFC (AR 28) and that Plaintiff had "not been deprived of the ability to perform work subject to the [RFC] assessed by this decision for any 12-month period since the alleged onset date" (AR 30).  Indeed, in May 2011, Dr. Enriquez found that Plaintiff's knees had normal ranges of motion and no tenderness, her motor strength was 5/5 throughout, her sensation was intact, her gait and balance were normal, and she did not require an assistive device to walk.  (AR 240-41.)  Dr. Enriquez found that Plaintiff had "no impairment-related physical limitations."  (AR 241.)  Although the ALJ gave little weight to Dr. Enriquez's conclusion that Plaintiff had no functional limitations, the doctor's benign examination findings nevertheless lend support to the ALJ's determination that Plaintiff could perform a range of medium work.  Moreover, as discussed, the ALJ reasonably found that Plaintiff had received only conservative treatment for her allegedly totally disabling left-knee impairment, which also tends to support the RFC assessment.

Plaintiff nevertheless argues that the ALJ "improperly substitut[ed] her opinion for that of a medical opinion because the ALJ must rely on some opinion or evidence when determining [Plaintiff's] RFC."  (J. Stip. at 5 (citing Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (finding ALJ improperly rejected treating and examining physicians' opinions based on his own assessment of plaintiff's testimony).)  It is true that an ALJ may not substitute her own opinion for a doctor's professional interpretation of clinical testing.  See Day v.

17

*Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (noting that hearing examiner erred by failing to "set forth any specific reasons for rejecting the . . . doctors' uncontroverted conclusions" and instead making "his own exploration and assessment as to claimant's physical condition" even though he "was not qualified as a medical expert"). But here, the ALJ did not improperly substitute her own lay opinion for any medical opinion; rather, she carefully analyzed the various medical opinions, treatment records, and Plaintiff's own testimony in formulating an RFC. The ALJ therefore acted within her authority. *See* *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."); §§ 404.1546(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity."), 416.946(c) (same). Indeed, no "acceptable medical source" has ever opined that Plaintiff had more significant physical limitations than those reflected in the RFC; rather, the three doctors who rendered opinions, one of whom performed a examination, found that Plaintiff had no physical limitations. *See* *Mills v. Comm'r of Soc. Sec.*, No. 2:13-CV-0899-KJN, 2014 WL 4195012, at *4 n.8 (E.D. Cal. Aug. 22, 2014) (noting that "plaintiff can hardly fault the ALJ for giving him the benefit of the doubt and assessing an RFC that is more favorable to plaintiff than most of the medical opinions in the record"). The ALJ therefore did not err in assessing Plaintiff's RFC.

Plaintiff argues that her left-knee MRI, which showed a meniscus tear and mild osteoarthrosis (AR 271-72), established

1   that she should be limited to sedentary work.  (J. Stip. at 3.)

2   But that MRI was not performed until March 2012, three and a half

3   years after her alleged onset date and less than 12 months before

4   the ALJ rendered her decision.  (AR 271-72.)  And as previously

5   discussed, after reviewing the MRI, a physician's assistant

6   treated Plaintiff's left-knee condition conservatively, with a

7   cortisone injection and medication.  (AR 296.)  Plaintiff

8   contends that even though the MRI was not conducted until March

9   2012, "the original injury dates back to . . . when [Plaintiff]

10  went to the ER on October 14, 2007."  (J. Stip. at 3.)  But the

11  notes from that emergency-room visit fail to reflect any left-

12  knee problems; to the contrary, Plaintiff complained of right-leg

13  pain and was diagnosed with a strained hamstring.  (See AR 274-

14  76.)  Plaintiff, moreover, did not complain of any leg or knee

15  pain for years after that emergency-room visit.  (See, e.g., AR

16  288-89, 291-93.)

17       Plaintiff contends that the ALJ erred by not addressing the

18  arguments in her post-hearing brief.  (J. Stip. at 4.)  But that

19  brief mainly summarized the evidence and argued that it "supports

20  a finding that [Plaintiff] is limited to sedentary work."  (See

21  AR 231-32.)  As previously discussed, the ALJ adequately

22  summarized and addressed the medical records and concluded that

23  Plaintiff could perform a range of medium work.  (See AR 27-30.)

24  Finally, Plaintiff argues that "nowhere in the decision does the

25  ALJ provide her reasoned analysis concerning [Plaintiff's]

26  extreme obesity."  (J. Stip. at 6.)  But the ALJ clearly did

27  assess Plaintiff's obesity, stating, among other things, that she

28  had "considered the potential impact of obesity in causing or

contributing to the co-existing impairments" and that no evidence showed "any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning." (AR 26.) As such, Plaintiff's argument fails. In any event, Plaintiff has not challenged the ALJ's finding that her obesity was not severe.

Because the ALJ's interpretation of the medical evidence was reasonable and supported by substantial evidence, remand is not warranted on this ground. See Molina, 674 F.3d at 1111 ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ is "final arbiter with respect to resolving ambiguities in the medical evidence").

B.   The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff contends that the ALJ erroneously discounted her subjective symptom testimony. (J. Stip. at 14-18.)

1.   Applicable law

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina, 674 F.3d at 1112 (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d

20

at 1035-36.  "First, the ALJ must determine whether the claimant
has presented objective medical evidence of an underlying
impairment [that] could reasonably be expected to produce the
pain or other symptoms alleged."  Id. at 1036 (internal quotation
marks omitted).  If such objective medical evidence exists, the
ALJ may not reject a claimant's testimony "simply because there
is no showing that the impairment can reasonably produce the
degree of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1282
(9th Cir. 1996) (emphasis in original).

        Second, if the claimant meets the first test, the ALJ may
discredit the claimant's subjective symptom testimony only if he
makes specific findings that support the conclusion.  See Berry
v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding
or affirmative evidence of malingering, the ALJ must provide
"clear and convincing" reasons for rejecting the claimant's
testimony.  Lester, 81 F.3d at 834; Ghanim v. Colvin, 763 F.3d
1154, 1163 & n.9 (9th Cir. 2014).

        In assessing a claimant's credibility, the ALJ may consider
(1) ordinary techniques of credibility evaluation, such as the
claimant's reputation for lying, prior inconsistent statements,
and other testimony by the claimant that appears less than
candid; (2) unexplained or inadequately explained failure to seek
treatment or to follow a prescribed course of treatment; (3) the
claimant's daily activities; (4) the claimant's work record; and
(5) testimony from physicians and third parties.  Thomas, 278
F.3d at 958-59; Smolen, 80 F.3d at 1284.  If the ALJ's
credibility finding is supported by substantial evidence in the
record, the reviewing court "may not engage in second-guessing."

1 | Thomas, 278 F.3d at 959.

2 |     2.   Relevant background

3 |     In an undated disability report, Plaintiff reported that she
4 | was unable to work because of high blood pressure, a heart
5 | murmur, and high cholesterol.  (AR 199.)

6 |     In a February 2011 function report, Plaintiff reported that
7 | she could not work because of high blood pressure.  (AR 209.)
8 | Her daily activities included showering, making breakfast, and
9 | doing "daily housewife chores" (AR 208), including cleaning and
10 | doing laundry (AR 210).  Plaintiff cooked daily, preparing
11 | sandwiches, salads, and complete meals.  (Id.)  She shopped in
12 | stores for 45 minutes twice a month.  (AR 211.)  Plaintiff had
13 | "no problem" with her personal care (AR 209), and her hobbies
14 | included sewing, which she did once a week "when [she was] able
15 | to."  (AR 212.)  She went to church every other Sunday when she
16 | had "the energy to go."  (Id.)

17 |     Plaintiff claimed that as she was "going about her day" she
18 | "sometimes fe[lt] shaky & dizzy."  (AR 208.)  She did not drive
19 | because of her "medication side affects [sic] instructions in
20 | getting drowsy."  (AR 211.)  Her condition affected her ability
21 | to climb stairs, and she could walk for one hour before needing
22 | to rest for one hour.  (AR 213.)

23 |     In a July 2011 disability report, Plaintiff wrote that she
24 | was "hospitalized for ongoing leg problems" in June 2011 and
25 | needed to wear compression stockings.  (AR 218.)  In an undated
26 | disability report, Plaintiff wrote that as of August 2011, her
27 | daily activities were "getting worse to do" and she "struggle[d]
28 | a lot."  (AR 226.)  She was "very limited to stand and walk" and

22

could not "do this for long periods of time." (<u>Id.</u>)  She wrote
that "[d]ue to her pain, swelling, and stiffness it is very
difficult to perform her daily activities"; she needed help
getting in and out of chairs and dressing. (AR 228.)  She wrote
that she was in "constant pain" because of her osteoarthritis.
(<u>Id.</u>)

At the July 2012 hearing, Plaintiff testified that she was
unable to work because of left-knee pain. (AR 46.)  Plaintiff
testified that she had been taking tramadol for pain for the
previous two months and had been prescribed a different
medication before that. (AR 46-47.)  The most Plaintiff was able
to walk was the distance from her car to the ALJ's hearing room.
(<u>Id.</u>)  She could stand for a half hour before needing to sit or
rest for a half hour. (AR 49.)  Plaintiff testified that she was
suffering from depression but was not taking medication or
receiving counseling for it. (AR 47-48.)

Plaintiff testified that she had no difficulty preparing
simple meals and taking care of her personal hygiene, such as
dressing herself. (AR 43.)  Her daughter and husband helped her
do chores. (<u>Id.</u>)  She could vacuum a little bit and went grocery
shopping with her husband for an hour two or three times a month.
(AR 43-44.)  She read books, knitted, and watched television for
about two hours a day. (AR 44-45.)  She also attended church
with her husband every once in a while. (AR 45.)

3.  <u>Analysis</u>

The ALJ found that Plaintiff's "medically determinable
impairment could reasonably be expected to cause some of the
alleged symptoms" but that her "statements concerning the

intensity, persistence and limiting effects of these symptoms are not credible to the extent [they] are inconsistent with" her RFC. (AR 27.)  As discussed below, the ALJ provided clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's credibility.

The ALJ noted that although Plaintiff testified at the hearing that she was unable to work because of her left-knee pain, "the record did not show any evidence of ongoing treatment for this alleged impairment until June of 2011, over two and a half years after the alleged onset date." (AR 28.)  Such a failure to seek treatment is a clear and convincing reason for discounting Plaintiff's credibility.  See Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (ALJ may rely on "unexplained, or inadequately explained, failure to seek treatment" in rejecting claimant's credibility).  Plaintiff contends that "[a] lack of treatment prior to 2011 is explained by the fact [that Plaintiff] did not have insurance until 2011" (J. Stip. at 16), citing a July 2011 treatment note stating that Plaintiff "request[s] new cardiology referral now that she has insurance - she didn't have any before" (AR 287).  But even during that visit, when Plaintiff apparently was insured, she did not complain of leg or knee pain.  (Id.) Indeed, musculoskeletal and neurological examinations were normal and her diagnoses included only dyslipidemia, hypertension, and cardiac murmur.  (Id.)  Moreover, even if Plaintiff lacked insurance before July 2011, she nevertheless sought medical care on several occasions in the years before that date and did not complain of left-knee pain at any of those visits.  (See, e.g.,

24

AR 274-76, 288-93.)   And although Plaintiff contends that her left-knee impairment "dates back to . . . when [she] went to the ER on October 14, 2007" (J. Stip. at 17), as previously discussed, at that visit Plaintiff complained of only right-leg pain and was diagnosed with a hamstring strain (AR 274-76).

The ALJ also permissibly discounted Plaintiff's credibility because she told Dr. Enriquez that her right knee hurt more than her left (AR 238), which was inconsistent with her statements at the hearing and to other doctors that she was disabled by left-knee pain.  (AR 28; <u>see also</u> AR 46, 282-83); <u>see</u> <u>Smolen</u>, 80 F.3d at 1284 (in assessing credibility, ALJ may consider "ordinary techniques of credibility evaluation," such as prior inconsistent statements).  Plaintiff contends that her statement may have been attributable to "some error in the translation because Social Security did not employ a certified interpreter for translating, but instead utilized [Plaintiff's] daughter." (J. Stip. at 17 (citing AR 238).)  But Plaintiff's speculative argument shows, at most, that the evidence was susceptible of different interpretations; that is insufficient to warrant remand.  <u>See</u> <u>Ryan</u>, 528 F.3d at 1198 (when "evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld" (internal quotation marks omitted)).

The ALJ also found that Plaintiff "received routine conservative treatment" for her left-knee pain.  (AR 28.) Indeed, as previously discussed, Plaintiff's condition was treated primarily with medication, which was noted to be helpful (<u>see, e.g.</u>, AR 285-86), and later with a single cortisone injection (<u>see</u> AR 296).  The ALJ permissibly discounted

Plaintiff's credibility on that basis. See Parra, 481 F.3d at 751 (noting that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment"); Tommasetti, 533 F.3d at 1040 (response to conservative treatment undermines allegations of disabling impairment); Walter v. Astrue, No. EDCV 09-1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discounted plaintiff's credibility based on "conservative treatment," including medication, physical therapy, and injection).

In sum, the ALJ provided clear and convincing reasons for discrediting Plaintiff's subjective complaints. Because those findings were supported by substantial evidence, this Court may not engage in second-guessing. See Thomas, 278 F.3d at 959. Plaintiff is not entitled to remand on this ground.

C.  Remaining Issue

Plaintiff contends the ALJ improperly found that she performed her past relevant work as a janitor at the light exertional level. (J. Stip. at 29-30.) Plaintiff acknowledges, however, that "[i]f the Court finds that [she] is capable of medium work, this contention is irrelevant." (Id. at 32.) As discussed above in Section V.A, the ALJ did not err in finding that Plaintiff had the RFC to perform a range of medium work. The Court therefore does not address this issue.

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[18] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: February 18, 2015

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[18]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

27